Opinion issued November 9, 2006













     




In The
Court of Appeals
For The
First District of Texas




NO. 01–05–00612–CR




MILTON ANTHONY THOMAS, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1007945




O P I N I O N

          Appellant, Milton Anthony Thomas, was charged by indictment with
aggravated robbery, enhanced by one prior felony conviction. See Tex. Pen. Code
Ann. § 29.03 (Vernon 2003). He pleaded not guilty to the primary offense and
pleaded “not true” to the enhancement. A jury found appellant guilty, found the
enhancement paragraph not true, and assessed punishment at 50 years’ confinement.
          Appellant raises four issues. In his first through third issues, appellant
contends that the trial court erred by overruling his objections to the State’s
peremptory challenges to exclude three veniremembers on the basis of race, in
violation of Batson v. Kentucky.


 In his fourth issue, appellant challenges the factual
sufficiency of the evidence to support his conviction.
          We reverse and remand.
Background
          After a dice game at a local nightclub, appellant shot and injured the
complainant while stealing the complainant’s winnings. At trial, the State used its 10
peremptory strikes to exclude six of the seven African-Americans on the panel of 38
eligible jurors. Veniremembers 5, 10, 14, 16, 21, 24, and 30 were African-American. 
The State struck each of the veniremembers, with the exception of number 16, who
ultimately served on the jury. The defense objected to the State having used “fifty
percent”


 of its peremptory challenges to exclude African-American veniremembers
based on race, in violation of Batson. The trial court overruled the objection.Challenge to Veniremember 14
          In his second issue, appellant contends that the trial court erred in overruling
his objection to the State’s peremptory strike of Veniremember 14, Janice Williams,
because the State “engaged in purposeful discrimination,” citing article 35.261 of the
Texas Code of Criminal Procedure and Batson v. Kentucky.



A.      The Law
          Article 35.261 and Batson v. Kentucky prohibit the use of peremptory
challenges to exclude veniremembers on the basis of race. Tex. Code Crim. Proc.
Ann. art. 35.261; 476 U.S. 79, 85, 109 S. Ct. 1712, 1716 (1986). Striking a
veniremember on the basis of race violates the equal protection guarantees of the
United States Constitution. Batson, 476 U.S. at 85, 106 S. Ct. at 1717.
          Resolution of a Batson challenge is a three-step process. Purkett v. Elem, 514
U.S. 765, 767–68, 115 S. Ct. 1769, 1770–71 (1995); Shuffield v. State, 189 S.W.3d
782, 785 (Tex. Crim. App. 2006); Goldberg v. State, 95 S.W.3d 345, 385 (Tex. 
App.—Houston [1st Dist.] 2002, pet. ref’d). First, the defendant must make a prima
facie showing that the State exercised a peremptory challenge on the basis of race. 
Purkett, 514 U.S. at 767, 115 S. Ct. at 1770; Shuffield, 189 S.W.3d at 785; Goldberg,
95 S.W.3d at 385. 
          Second, the burden of production shifts to the State to articulate a race-neutral
reason for its strike. Purkett, 514 U.S. at 767, 115 S. Ct. at 1770; Shuffield, 189
S.W.3d at 785; Goldberg, 95 S.W.3d at 385. A reason is deemed race-neutral if no
discriminatory intent is inherent in the explanation given. Purkett, 514 U.S. at 768,
115 S. Ct. at 1771. This step does not require an explanation that is persuasive. Id.
at 767–68, 115 S. Ct. at 1771. 
          Finally, the trial court determines whether the defendant has carried his burden
to prove purposeful discrimination. Id. at 767–78, 115 S. Ct. at 1770–71; Shuffield,
189 S.W.3d at 785. Because it is the defendant’s burden to prove, by a
preponderance of the evidence, that the purported race-neutral explanation is mere
pretext for purposeful discrimination, the defendant is given an opportunity to rebut
the State’s reason. Simpson v. State, 119 S.W.3d 262, 268 & n.48 (Tex. Crim. App.
2003).
B.      Standard of Review
          We examine a trial court’s ruling on a Batson challenge under the “clearly
erroneous” standard of review. Gibson v. State, 144 S.W.3d 530, 534 (Tex. Crim.
App. 2004); Goldberg, 95 S.W.3d at 385. To hold that a decision was clearly
erroneous, we must be left with a “definite and firm conviction that a mistake has
been committed.” Goldberg, 95 S.W.3d at 385 (quoting Vargas v. State, 838 S.W.2d
552, 554 (Tex. Crim. App. 1992)). The “clearly erroneous standard is a highly
deferential standard because the trial court is in the best position to determine whether
[the State’s] facially race-neutral explanation for a peremptory strike is genuinely
race-neutral.” Gibson, 144 S.W.3d at 534. We focus on the genuineness rather than
on the reasonableness of the State’s asserted race-neutral reason. Id. at 533–34. 
          In evaluating the genuineness of State’s proffered race-neutral reasons, we may
consider (1) whether the reason given is related to the facts of the case; (2) whether
the State meaningfully questioned the challenged veniremember; (3) whether persons
with the same or similar characteristics as the challenged veniremember were not
struck; (4) whether there was disparate examination of the members of the venire, i.e.,
questioning the challenged veniremember in a manner designed to evoke a certain
response without asking the same question of the other venirepersons; and (5)
whether an explanation was based upon a group bias although the specific trait is not
shown to apply to the challenged juror. Williams v. State, 804 S.W.2d 95, 105–06
(Tex. Crim. App. 1991). 
C.      Analysis
          During voir dire, the State asked veniremembers, “is there anyone . . . who has
been a victim of a crime, a violent crime, aggravated robbery or aggravated assault
or something violent, you, a close family member, or friend?” The record indicates
that five eligible veniremembers (numbers 12, 14, 19, 26, and 27) answered in the
affirmative, as follows:
          [State]:        . . . Juror No. 14, you have?
          [Williams]:  My boyfriend was a victim of aggravated robbery.
          [State]:        You have a boyfriend that was convicted?
          [Williams]:  No, he was a victim.
          [State]:        That changes it, doesn’t it?
          [Williams]:  Yes.
          [State]:        Anything about that situation that would keep you from being a
fair and impartial juror?
          [Williams]:  No. 
          [State]:        Or treat this case differently and listen to the testimony?
          [Williams]:  Yes.
          [State]:        Anybody—Juror No. 12?
          [No. 12]:      I was a victim of aggravated robbery.
          [State]:        Anything about that situation that would prevent you from being
a fair and impartial juror?
          [No. 12]:      No.
          [State]:        How long ago was it?
          [No. 12]:      It was over nine years ago.
          [State]:        . . . Juror No. 19?
          [No. 19]:      I had a daughter that was mugged and shot in the head, but
thankfully she lived. But that made quite an impression on me.
          [State]:        Anything about that experience that would prevent you from
being fair and impartial?
          [No. 19]:      No.
          [State]:        . . . Juror No. 26?
          [No. 26]:      My mom and my brother were assaulted nearby the apartments
where we lived.
          [State]:        Anything about that situation that would prevent you from being
a fair and impartial juror?
          [No. 26]:       Possibly, yes.
          [State]:        And how would that happen?
          [No. 26]:      I wouldn’t want that to happen to anybody else, and I would very
much pursue for that person was guilty [sic] to get what they
deserve.
          [State]:        Would you hold it against this defendant?
          [No. 26]:      I’m not sure if I could or not because particularly I don’t know
what happened there, but as far as what happened with my mom
and my brother they could have gotten killed with a gun and by
stab wounds [sic].
          [State]:        Mr. Thomas is not the one that hurt your loved ones, is he?
          [No. 26]:      No.
          [State]:        Could you judge this case based on the evidence that you see and
the testimony of the witnesses or would you always have what
happened to your mom or brother in the back of your head?
          [No. 26]:      Actually I would focus on what’s going on now because what
happened then hopefully somebody will come forward and fix
that problem [sic].
          [State]:        Juror 27, you raised your hand.
          [No. 27]:      My sister was a victim of armed robbery.
          [State]:        Is there anything about that situation that might prevent you from
being a fair and impartial juror?
          [No. 27]:      I don’t think so. I , of course, have some feelings about that; but
I would certainly try to be fair.
          [State]:        Like what, what feelings?
          [No. 27]:      Well, I worked at the same store it happened at. It was several
years ago. I just wasn’t working that night, and just what
happened with her and my friend and that it was unfair and that
it shouldn’t have happened.
          [State]:        In other words, something that happened to a loved one that when
[sic] they went through it you kind of felt like you did, too.
          [No. 27]:      Right.
          . . . 
          [State]:        Juror No. 12, you said you had been a victim of an aggravated
robbery?
          [No. 12]:      Yes.
          [State]:        Did they catch the guy?
          [No. 12]:      Yes.
          [State]:        . . . Did they catch the guy in your boyfriend’s case, Juror No. 14?
          [Williams]:  Yes.
          [State]:        Juror No. 19, did they catch the guy that shot your daughter?
          [No. 19]:      No.
          [State]:        Juror No. 26, did they catch the guy that assaulted your mom and
brother?
          [No. 26]:      No.
          Among the five who answered that they or a close family member or friend had
been victimized by crime, Williams was the sole African-American and the sole
veniremember that the State struck.


 
          At the close of voir dire, after the clerk announced the jury selection, appellant
objected as follows:
Judge, for the record, the eligible panel was through Juror No. 38. In the
first 38 jurors, the African American jurors were No. 30, 16, 21, 24, 10,
and 5. So, they were—and there was 16 [sic; should be 14 based on the
record]. So there were six African Americans in the first 38; the State
struck 5 of them. For that reason under Batson we would object to the
Prosecutor using 50 percent of her strikes on black jurors and obviously
not a race neutral one [sic].
 
          The State does not dispute that appellant made a prima facie showing that the
State exercised its peremptory challenges on the basis of race. See Purkett, 514 U.S.
at 767, 115 S. Ct. at 1770; Shuffield, 189 S.W.3d at 785; Goldberg, 95 S.W.3d at 385. 
Hence, the issue of whether a prima facie showing was actually made is moot. See
Simpson, 119 S.W.3d at 268.
          The burden of production then shifted to the State to give a race-neutral
explanation. Purkett, 514 U.S. at 767, 115 S. Ct. at 1770. As to Williams, the State
proffered: “[Williams], well, her boyfriend was a crime victim, and I don’t put any of
those on my jury.” 
          Contending that the State’s proffered reason was pretext for purposeful
discrimination because the State did not strike the non-African-American crime
victims, appellant argued as follows:
          [Defense Counsel]:          . . . What was the reason on 14?
          [State]:                             Her boyfriend is a prior crime victim.
          [Defense Counsel]:          How does that make her bad for the State?
          [State]:                             I asked the question you or anyone else who’s been
a victim of a crime. I don’t put crime victims on my
panels. I don’t like them.
          [Defense Counsel]:          You didn’t strike all the other crime victims. You
just struck the black crime victim.
          [State]:                             I agreed to 26 who had the same issue.



          [Defense Counsel]:          You didn’t strike Juror No. 12.
          [State]:                             You did.



          [Defense Counsel]:          Right, but she’s a crime victim.
          . . . .
          [Defense Counsel]:          Juror No. 14, the only answer that was offered was
the fact that she was a crime victim. She did not
strike all the other crime victims, only the black
crime victims [sic].
          [State]:                             I agreed to 26, which was also a victim, the identical
situation with someone in her family.
          [Defense Counsel]:          But Juror No. 12 also was on the record indicating
she was a crime victim as well. She was not struck.
          [The Court]:                     Denied.
          [Defense Counsel]:          So was the lady, Juror No. 19, she had a daughter
that was shot in the head, she didn’t strike her.
          [State]:                             You struck her.
          [Defense Counsel]:          Right, I struck her; but my point is she struck the
black crime victim. She didn’t strike all the white
crime victims.
          [The Court]:                     That will be denied. 
          We consider whether the State’s proffered reason was pretext for purposeful
discrimination by examining whether statistics show a disproportionate use of
peremptory strikes to exclude African-Americans from the venire and whether
comparative evidence demonstrates disparate treatment of African-American
veniremembers. See Miller-El v. Dretke, 545 U.S. 231, 240–41, 253–55, 264–66, 125
S. Ct. 2317, 2325–26, 2332–33, 2338–40 (2005) (sustaining Batson challenge on
basis of several factors, including “bare statistics” and “side-by-side comparisons”
of veniremembers who were struck with those who were not); Vargas v. State, 838
S.W.2d 552, 557 (Tex. Crim. App. 1992) (holding that comparative evidence should
be considered); Vargas v. State, 859 S.W.2d 534, 535 (Tex. App.—Houston [1st
Dist.] 1993, pet. ref’d) (sustaining Batson challenge on basis of statistics, comparative
evidence, and failure to question veniremember).    
          Here, the statistics show that the State used its 10 peremptory strikes to exclude
six of the seven or 86% of the African-Americans on the panel of 38 eligible jurors. 
Veniremembers 5, 10, 14, 16, 21, 24, and 30 were African-American. The State
struck all of the African-American veniremembers, with the exception of number 16,
who ultimately served on the jury. As in Vargas, the State’s strike of all of the
African-American veniremembers, except one, constitutes disproportionate use of its
peremptory strikes. See Vargas, 859 S.W.2d at 534, 535 (holding that State’s strike
of five of six African-Americans on 36-member venire constituted disproportionate
use of peremptory strikes). 
          In addition, “side-by-side” comparisons show that the State’s reason for
exercising a peremptory strike against Williams, her friend having been victimized
by crime, was equally on point with non-African American veniremembers 12, 19,
26, and 27. The record shows that venireperson 12 had, herself, been a victim of
aggravated robbery; the daughter of venireperson 19 had been mugged and shot in the
head; the mother and brother of venireperson 26 had been assaulted; and the sister of
venireperson 27 had been a victim of aggravated robbery (the very offense at issue
in this case). The State did not strike veniremembers 12, 19, or 26, and veniremember
27 served on the jury. The comparative evidence demonstrates disparate treatment
of Williams. See Miller-El, 545 U.S. at 241, 125 S. Ct. at 2325–26 (explaining that
when proffered reason for striking black panelist applies just as well to otherwise-similar nonblack who is permitted to serve, “that is evidence tending to prove
purposeful discrimination to be considered at Batson’s third step”); Vargas, 859
S.W.2d at 534–35 (holding that State’s strike of African-American legal assistant on
basis that she was member of legal profession but failing to strike non-African-American paralegal constituted disparate treatment). 
          Further, in response to the State’s inquiry as to whether each venireperson’s
previous experience with violent crime would affect his or her ability to be a fair and
impartial, Williams stated that it would not. However, venireperson 26 responded,
“Possibly, yes.” Venireperson 27 stated, “I don’t think so. I, of course have some
feelings about that; but I would try to be fair.” Again, the State agreed to strike
number 26 only in exchange for number 22,


 and the State did not strike number 27.
          Notably, the State bypassed veniremember 12 on the list before striking
Williams, and still had three of her ten peremptory strikes available when she reached
venireperson 27 on the list. If the State genuinely meant to exclude all crime victims
from the jury as stated, it follows that it would have struck veniremember 12 first, and
then struck veniremembers 19 and 27 as well. See Vargas, 859 S.W.2d at 535. 
          We recognize that an appellate court cannot automatically infer racial bias
when the State’s reasons for striking a minority veniremember would apply to an
unchallenged non-minority veniremember. Esteves v. State, 849 S.W.2d 822, 824 n.2
(Tex. Crim. App. 1993). However, racial bias “can be imputed when there is
disparate treatment of the veniremembers as to the sole reason or primary reasons
stated for the exercise of the peremptory challenge.” Id.
          Here, there is disparate treatment of the veniremembers as to the sole reason
stated for the exercise of the State’s peremptory challenge as to Williams. Comparing
this strike with the treatment given other veniremembers who were also victims of
crime and who, unlike Williams, even expressed a questionable ability to act
impartially, supports a conclusion that race was significant in determining which
jurors were challenged. See Miller-El, 545 U.S. at 241, 125 S. Ct. at 2325–26;
Vargas, 859 S.W.2d at 535.
          We cannot speculate as to whether other reasons may exist in the record that
would have supported the strike of Williams. See Miller-El, 545 U.S. at 252, 125 S.
Ct. at 2332; Young v. State, 856 S.W.2d 175, 176 (Tex. Crim. App. 1993).
          In drawing a jury to try an African-American defendant, six of the seven
qualified African American veniremembers were peremptorily struck from a venire
of 38. The record does not support the State’s sole proffered race-neutral reason for
its strike of Williams—that she was a victim of crime. The record shows that the
non-African-American veniremembers who were also crime victims were not struck. 
Because the record shows disparate treatment of veniremember 12, we hold that the
trial court’s finding of no racial discrimination was clearly erroneous. See Vargas,
859 S.W.2d at 535. Accordingly, we sustain appellant’s second issue. 
          The exercise of even one racially-motivated peremptory strike invalidates the
jury selection process and requires a new trial. Whitsey v. State, 796 S.W.2d 707, 716
(Tex. Crim. App. 1989). 
 
 
 
Conclusion
          We reverse the trial court’s judgment and remand for further proceedings.



 

                                                             Laura Carter Higley
                                                             Justice
 
Panel consists of Justices Nuchia, Jennings, and Higley.
Publish. See Tex. R. App. P. 47.2(b).